IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

COURTNEY ENGEVOLD o/b/o E.L.,
a minor child,

    Plaintiff,

vs.

Commissioner of the Social Security
Administration,

    Defendant.

No. C13-1036

RULING ON JUDICIAL REVIEW

TABLE OF CONTENTS

I.   INTRODUCTION .................................... 2

II.  PRINCIPLES OF REVIEW ............................ 2

III. FACTS ............................................. 4

IV. CONCLUSIONS OF LAW ............................. 6
    A.   ALJ's Disability Determination ..................... 6
    B.   Objections Raised By Claimant ...................... 7
        1.   Functional Equivalence ......................... 7
        2.   Medical Equivalence .......................... 10

V.   CONCLUSION ..................................... 13

VI. ORDER ........................................... 13

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 4) filed by Plaintiff Courtney Engevold on behalf of her minor son, E.L., requesting judicial review of the Social Security Commissioner's decision to deny an application for Title XVI supplemental security income ("SSI") benefits for E.L. Engevold asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide SSI benefits for E.L. In the alternative, Engevold requests the Court to remand this matter for further proceedings.

# II. PRINCIPLES OF REVIEW

Pursuant to 42 U.S.C. § 1383(c)(3), the Commissioner's final determination after an administrative hearing not to award SSI benefits is subject to judicial review to the same extent as provided in 42 U.S.C. § 405(g). 42 U.S.C. § 1383(c)(3). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence."

*Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision "extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also

be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## III. FACTS

On October 5, 2010, E.L. was born at 31 weeks of gestational age, weighing 3 pounds and 4 ounces. E.L. spent several weeks in the NICU, and was discharged with a diagnosis of multicystic kidney and choroid plexus cyst. On November 4, 2010, E.L. was evaluated by Dr. Aditya Sukhwal, M.D., for his one-month check-up. The examination was unremarkable, except for a blocked tear duct and small umbilical hernia.

On December 2, 2010, E.L. was referred to Dr. John Kryger, M.D., for evaluation of his kidneys. Upon examination, Dr. Kryger found that E.L. had one non-functioning kidney and one normal kidney. Otherwise, Dr. Kryger noted that E.L. was in "good general health." Dr. Kryger recommended conservative treatment for E.L.'s kidney.

On December 10, 2010, E.L. returned to Dr. Sukhwal for his two-month check-up. Upon examination, Dr. Sukhwal determined that E.L. was a "healthy" two-month old. On January 12, 2011, E.L. returned to Dr. Sukhwal for evaluation of a right inguinal hernia. Because the hernia was increasing in size, Dr. Sukhwal referred E.L. to Dr. Leonard L. Go, M.D., for consultation. Dr. Go noted that E.L.'s physical exam was normal, except for the right inguinal hernia. Dr. Go recommended surgical repair. Surgery was performed without complication on February 11, 2011. On March 23, 2011, E.L. returned to Dr. Sukhwal for a routine child health examination. Dr. Sukhwal found that E.L. was a "healthy" five-month old.

On April 5, 2011, Dr. Mary N. Harkness, M.D., reviewed E.L.'s medical records and filled out a "Childhood Disability Evaluation Form" for Disability Determination Services ("DDS"). Dr. Harkness found that E.L.'s impairments were prematurity and multicystic kidney. Dr. Harkness determined that E.L.'s impairments were severe, but did not meet, medically equal, or functionally equal the Social Security Listings.

Dr. Harkness found that E.L. had no limitations in acquiring and using information, attending and completing tasks, interacting and relating with others, moving about and manipulating objects, and self care. Dr. Harkness further determined that E.L. had a marked limitation in health and physical well-being. E.L.'s marked limitation was based on his premature birth and right multicystic kidney. Dr. Harkness noted, however, that on a recent function report E.L.'s mother showed no concerns about his health or development. Similarly, Dr. Harkness also pointed out that at E.L.'s most recent check-up, his mother had no complaints or concerns.

On October 12, 2011, E.L. had a 12-month child health evaluation performed by Dr. Karen Scott, M.D., a new treating doctor. In a pediatric health history form filled out by E.L.'s mother for Dr. Scott, E.L.'s mother noted no "particular concerns regarding [E.L.'s] health or development."[1] Upon examination, Dr. Scott found E.L.'s growth and development to be "fine." E.L. returned to Dr. Scott for an 18-month wellness evaluation on March 27, 2012. Upon examination, Dr. Scott found E.L.'s growth and motor skills to be "fine." Dr. Scott had a "little" concern about E.L.'s language development and developmental level of play.

On May 21, 2012, Dr. Peter Alt, M.D., placed tubes in E.L.'s ears for treatment of recurrent ear infections and speech delay. Upon physical examination, Dr. Alt noted that E.L. had normal communication skills and normal behavior for his age. There were no complications from the ear surgery.

On July 2, 2012, E.L. was referred to Dr. Christopher Cooper, M.D., for a check and evaluation of his multicystic kidney. E.L.'s mother reported that E.L. was "doing well with no urinary tract infections or hematuria."[2] Upon examination, Dr. Cooper noted that E.L. was meeting his developmental milestones as age appropriate. Dr. Cooper also

---

[1] Administrative Record at 351.

[2] *Id.* at 366.

5

noted that E.L. had no developmental concerns and no major behavior concerns. Diagnostic imaging of E.L.'s kidneys was consistent with prior kidney findings. E.L. continued to have a right multicystic kidney and normal left kidney. Dr. Cooper recommended follow-up in one year to check E.L.'s kidneys.

## IV. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that E.L. was not disabled. In making this determination, the ALJ was required to complete the three-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 416.924; *Moore ex rel. Moore v. Barnhart*, 413 F.3d 718 (8th Cir. 2005); *Pepper ex rel. Gardner v. Barnhart*, 342 F.3d 853 (8th Cir. 2003). In *Moore*, the Eighth Circuit Court of Appeals explained the three-step sequential test as follows:

> At the first step, the ALJ determines whether the child is engaged in substantial gainful activity. *See* 20 C.F.R. § 416.924(b). At the second step, an ALJ determines whether the child has an impairment that is 'severe.' 20 C.F.R. § 416.924(c). At the third step, an ALJ determines whether the child's impairment is medically or functionally equivalent in severity to the impairments listed in the disability regulations. 20 C.F.R. § 416.924(d); 20 C.F.R. pt. 404, subpt. P, app. 1.

*Moore*, 413 F.3d at 721. At step two, "if the impairments result in no more than minimal functional limitations, the impairments are not severe and the child is not disabled." *Pepper*, 342 F.3d at 854. Under step three, "a child's impairment is medically equal to a listed impairment if it is at least equal in severity and duration to the medical criteria of the listed impairment." *Id.* (citing 20 C.F.R. § 416.926(a)). The Social Security Regulations provide that a child's impairments may also functionally equal a listed impairment under certain circumstances. *See* 20 C.F.R. § 416.926a(a). An impairment is functionally equal to a listed impairment, "if there is an 'extreme' limitation in one of

six specific functional domains, or a 'marked' limitation in at least two domains." *Pepper*, 342 F.3d at 854; 20 C.F.R. § 416.926a(a). The domains to be considered by the ALJ are: acquiring and using information, attending and completing tasks, interacting and relating with others, moving around and manipulating objects, caring for oneself, and health and physical well being. *See* 20 C.F.R. § 416.926a(a)(1)(i)-(vi).

The ALJ applied the first step of the analysis and determined that E.L. had not engaged in substantial gainful activity since the date his application for SSI benefits was filed.[3] At the second step, the ALJ concluded from the medical evidence that E.L. had the following severe combination of impairments: multicystic kidney disease and frequent colds with ear infection. At the third step, the ALJ found that E.L. did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. Also at the third step, the ALJ determined that E.L. did not have an impairment or combination of impairments that functionally equaled the listings. Therefore, the ALJ concluded that E.L. was not disabled.

### B. Objections Raised By Claimant

Engevold argues that the ALJ erred in two respects. First, Engevold argues that the ALJ erred by failing to find E.L.'s impairments are functionally equivalent to a listing. Second, Engevold argues that the ALJ erred by failing to find E.L.'s impairments are medically equivalent to a listing.

#### 1. Functional Equivalence

Engevold argues that the ALJ erred by not finding E.L.'s impairments to be functionally equivalent to a listing. Specifically, Engevold argues that the ALJ should have found E.L. had a marked limitation in at least one of the following domains: Acquiring

---

[3] The ALJ noted that E.L. "was born on October 5, 2010. Therefore, he was a newborn/young infant on January 14, 2011, the date the application was filed, and is currently an older infant." Administrative Record at 20.

7

and using information; attending and completing tasks; and/or interacting and relating to others. Engevold points out that the ALJ determined that E.L. had a "marked" limitation in the domain of "health and physical well-being." *See* Administrative Record at 28. As such, had the ALJ also determined that E.L. had a "marked" limitation in the domain of "acquiring and using information," "attending and completing tasks," and/or "interacting and relating to others," then E.L. would meet the requirement for disability at step three of the sequential test. *See Pepper*, 342 F.3d at 854 (providing that a claimant's impairment is functionally equivalent to the listings if the ALJ finds a "marked" limitation in at least two domains); *see also* 20 C.F.R. § 416.926a(a). Engevold concludes that the evidence in the record supports a finding of "marked" limitation in at least one additional domain for E.L., thereby warranting a finding of disability.

In her decision, the ALJ both thoroughly discussed and fully explained her reasoning for finding that E.L. has "less than marked limitation" in the domains of acquiring and using information, attending and completing tasks, and interacting and relating with others.[4] For example, with regard to the "acquiring and using information" domain, the ALJ noted that in March 2012:

> pediatrics reported that there was some concern about [E.L.'s] language development but he was able to respond to his name, he seemed to understand requests, and there was no concern about hearing. He seemed to be receptive enough to enjoy music. At a physical examination on May 21, 2012, at the time of the ear tube surgery, the examining doctor noted that there had been developmental speech and language concerns but then found at the time that he displayed normal language skills for his age. Examining sources at the UIHC surmised, on evaluation on July 2, 2012 for kidney problem, that he had met his developmental milestones as age appropriate and did

---

[4] *See* Administrative Record at 22-26 (providing thorough discussion and explanation of her reasons for finding less than marked limitation in specific domains).

8

>not mention that he had any problems with communication or acquiring information.

(Administrative Record at 23.) Next, with regard to "attending and completing tasks," the ALJ determined that:

> At the IFSP evaluation,[5] [E.L.] at 17 months had an adjusted age of 15 months. He scored in the 15-month old level on the adaptive domain. Yet, he did not seem to be significantly impaired at this point, even as a 17-month old (older infant). He was able to sip liquids from a straw, brush his teeth with assistance and chew textured food. His parent was instructed that she needed to help him practice washing his face and hands and have him help with tasks around the house. His psychiatric status was normal as reported by the examining doctor on May 21, 2012.

(Administrative Record at 24.) Finally, in addressing the domain of "interacting and relating to others," the ALJ found that:

> There is conflicting evidence on this matter but the undersigned is convinced that [E.L.] is not seriously impaired in this area of functioning. For example, the IFSP evaluation said that [E.L.] had a 41 percent delay on the social-emotional section. Purportedly, he showed anxiety on being separated from his mother but expressed affection to the primary caregiver. . . . As noted above, the treating source in March 2012 noted that [E.L.] would respond to his name and seemed to understand requests, even though it was said that he had a vocabulary that was limited to a few words. He would use his finger to point and indicate his interest in things and he would bring objects and show them to a person. A month after the IFSP evaluation, [E.L.] reportedly had normal communication for his age. UIHC medical sources in July 2012 mentioned that he had met his developmental milestones as age appropriate. Review of systems at the time revealed 'no development concerns and no major behavior concerns.' He

---

[5] The IFSP evaluation was a non-medical, social services assessment conducted in March 2012. *See* Administrative Record at 180-184.

9

> was alert, cooperative, in no distress, well nourished and appeared well hydrated.

(Administrative Record at 25-26.)

Having reviewed the entire record, the Court finds that the ALJ properly addressed and explained her reasoning for finding that E.L. did not have a marked limitation in any of the following domains: Acquiring and using information; attending and completing tasks; and interacting and relating to others. Furthermore, the ALJ's conclusions regarding the functional domains are supported by substantial evidence on the record as a whole. *See Gates*, 627 F.3d at 1082 (Providing that courts will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole."). Thus, the Court concludes that Engevold's argument that the ALJ erred by failing to find E.L.'s impairments are functionally equivalent to a listing is without merit. Accordingly, even if inconsistent conclusions could be drawn on this issue, the Court upholds the conclusions of the ALJ because they are supported by substantial evidence on the record as a whole. *Guilliams*, 393 F.3d at 801.

### 2. *Medical Equivalence*

Engevold argues that the ALJ erred by failing to find E.L.'s impairments are medically equivalent to a listing. Specifically, Engevold maintains that the ALJ should have considered whether E.L.'s impairments are medically equivalent to Listing § 112.02. Engevold also argues that the ALJ should have obtained advice from a medical expert on the issue of medical equivalency.

The burden of proof is on the claimant to establish that his or her impairment equals a listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990)). In order to equal a listing, the impairment must meet all of the criteria for the specified listing. *Id.* Furthermore, "'[m]edical equivalence must be based on medical findings.'" *Id.* (quoting 20 C.F.R. § 416.926(b)).

Listing § 112.02 provides in pertinent part:

> Organic Mental Disorders: Abnormalities in perception, cognition, affect, or behavior associated with dysfunction of the brain. The history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrate or support the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities.

20 C.F.R. pt. 404, subpt. P, app. 1, § 112.02. Here, there is no evidence in the record that E.L. suffers from an organic mental disorder. There is no evidence in the record that E.L. has a "history and physical examination or laboratory tests, including psychological or neuropsychological tests, demonstrat[ing] or support[ing] the presence of an organic factor judged to be etiologically related to the abnormal mental state and associated deficit or loss of specific cognitive abilities, or affective changes, or loss of previously acquired functional abilities." *Id.* Moreover, E.L.'s treating doctors routinely noted appropriate development for E.L.[6] Significantly, in July 2012, medical records close in time to the ALJ's September 2012 decision, indicated that E.L. had "[n]o developmental concerns; [and] no major behavioral concerns."[7] The July 2012 medical records also provide that E.L. was "meeting his developmental milestones as age appropriate."[8]

Having reviewed the entire record, the Court determines that the ALJ did not err by not finding that E.L.'s impairments medically equal Listing § 112.02. Significantly,

---

[6] *See* Administrative Record at 206 (Dr. Kryger found that E.L. was in "good general health"); 282 (Dr. Sukhwal found E.L. to be a "healthy" 2-month old); 300 (Dr. Sukhwal found E.L. to be a "healthy" 5-month old); 343 (Dr. Scott finding E.L.'s growth and development to be "fine" at 12 months); and 382 (Dr. Scott finding E.L.'s growth and motor skills to be "fine" at 18 months).

[7] Administrative Record at 367.

[8] *Id.* at 366.

there is not substantial evidence in the record to support such a finding. Therefore, the Court concludes that Engevold's argument that E.L.'s impairments are medically equal to Listing § 112.02 is without merit.

Turning to the issue of the ALJ obtaining a medical expert's opinion on the question of medical equivalency, Social Security Ruling 96-6p provides that an ALJ must obtain an updated medical opinion from a medical expert when (1) no additional medical evidence is received, but the ALJ finds that the record suggests a judgment of equivalence may be reasonable; or (2) when additional medical evidence is received that the ALJ believes may change the state agency consultant's opinion that a claimant's impairments are not equivalent to an impairment in the listings. *Id.* Here, the second option would be applicable, as there is evidence in the record that post-dates the state agency findings. In considering this issue, the Court finds the Commissioner's argument persuasive. In her brief, the Commissioner points out that:

> First, the ALJ did not find E.L. met or equaled a Listing. Second, none of the medical evidence submitted after the two reviews of State-agency medical consultants revealed any diagnosis or allegation of an organic mental disorder or suggested that E.L. met or equaled a Listing. . . . As noted above, in the last treatment note of record from July 2012, E.L.'s mother stated she had no developmental or behavioral concerns, and Dr. Cooper concluded E.L. was meeting his developmental milestones as age appropriate. Thus, the ALJ did not err in not obtaining an updated medical opinion.

Commissioner's Brief (docket number 13) at 19-20. The Court agrees and finds that there is no evidence in the record which suggests the ALJ should have believed that medical evidence post-dating the state agency opinions would have changed the state agency's initial opinions. Thus, the Court concludes that it was unnecessary for the ALJ to obtain an updated medical opinion from a medical expert.

## V. CONCLUSION

The Court concludes that the ALJ properly determined that E.L.'s impairments are not functionally equivalent to a listing. Similarly, the Court also concludes that the ALJ properly determined that E.L.'s impairments are not medically equivalent to a listing. Accordingly, the Court determines that the ALJ's decision is supported by substantial evidence and shall be affirmed.

## VI. ORDER

For the foregoing reasons, it is hereby **ORDERED**:

1. The final decision of the Commissioner of Social Security is **AFFIRMED**;
2. Plaintiff's Complaint (docket number 4) is **DISMISSED** with prejudice; and
3. The Clerk of Court is directed to enter judgment accordingly.

DATED this 26th day of August, 2014.

JON STUART SCOLES
CHIEF MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA